All right, the next case we'll hear is Perkins v. International Paper. And I guess you're on again, Ms. Polvey. May it please the Court. I'm here on behalf of Matthew Perkins, the appellant in this case. Like Ms. Evans, Mr. Perkins was a longtime employee of the finished products department. He was there for an extensive period of time, essentially his whole professional career, but he left nine years early. And his case was dismissed at summary judgment. And I have three kind of key areas I want to address during my presentation to you today. The first relates to the constructive discharge and hostile work environment claim and the evidence that's before you. The avenues of proof for both cases are both the direct and McDonnell Douglas burden-shifting framework. First and foremost, I want to emphasize the direct evidence. Some of that direct evidence, the direct proof, comes from HR's own records. That the investigation in response to complaints of discrimination in the workplace and concerns by Mr. Perkins were identified and responded by Gary Nyman, the finished products department manager, by describing Mr. Perkins as a group of people, as part of a group of people that keep things stirred up. And that's found on JA 1034, within a three-page summary compiled by the HR investigator, talking about the type of workplace that was in concern for both of my clients. I need to emphasize, again, the importance of the overall hostile work environment picture here, is that, like Ms. Evans, Ms. Evans being the first black female supervisor in the finished... Let's not use the evidence in that case. Stick to the record in this case. Yes, Your Honor. But the affidavits are the same, right? Yes. The same affidavits of third parties were admitted in the Evans case that were admitted in the Perkins case. That's correct, Your Honor. And specifically, each of those individuals who testified, be it through affidavits and depositions, all testified about specific things that they observed Mr. Perkins experienced. For example, with Mr. Perkins, Mr. Perkins was the first black male to obtain the A-level position within the finished products department. That's essentially the highest level of the operating technicians. He experienced barriers continuously. And, for instance, I think one of the best examples to kind of show, it's one that predates the 300-day window, but, again, in a hostile work environment type of atmosphere, there's a continuing act availability of evidence. I'm wondering whether you could make a distinction between hostile work environment based on race... Yes. ...and disparate treatment. And on disparate treatment, the analysis is going to be different, and he seems to be suggesting that he was treated differently. He doesn't talk about things racial. He talks about being treated differently, and the question then raises all kinds of questions just about his qualifications, those of his comparators, those jobs he didn't get or did get or whatever. And maybe you could focus on that a little bit. Yes, Your Honor. I consider them to be distinguishably different, like kind of subcategories of Mr. Perkins' claims with different essentially evidence and essentially underlying facts that relate. Like, for instance, with the disparate treatment, my client... I'm not asking you to address that. What I'm suggesting is that your argument seems to be focusing on disparate treatment. And if you're arguing hostile work environment, you should argue hostile work environment evidence. Right. Well, let me distinguish one of the most important race discrimination, hostile work environment pieces of evidence, which was my client's continuous efforts to prevent discriminatory treatment in how individuals within the finished products department were being assigned on the winder. So this particular paper machine is like a football field-sized equipment. It's huge. There's a number of employees working on all different parts of it. The winder is one of the very labor-intensive, hot areas to work. Well, the bottom line is that the argument is he observed that African Americans were being assigned to a lesser level than whites or a less desirable job. One's on the wet end and one's on the dry end. Right. But that's disparate treatment, and he's complaining about that. But how does that create a hostile work environment? That may be the African Americans are treated differently, which is a totally different analysis. And I thought you were trying to focus on hostile work environment. Yes, Your Honor. There's nothing in the record to say that Mr. Perkins was called something so offensive as the N-word to his face or some type of hostile work environment evidence of that sort. But when we look at what Mr. Perkins does describe about the isolation with the responses he received from the managers about when he tried to talk about his own experiences or that of other people, he did receive a hostile work environment in response to this race discrimination opposition, both for himself and others. How do you know it was race discrimination? How do you know it wasn't performance-oriented or employee-level oriented or the type of job he was doing or his colleagues, the area where he was working? In other words, to assume that he was yelled at or he was not assigned something or his views weren't considered is consistent with almost anything. And the question is, you're claiming a hostile work environment based on race. And the evidence, maybe you should be mustering that evidence, whatever evidence is in the record. The hostile work environment, we have to look at the totality of what was occurring, be it on the winder. For example, another black employee being hit by a white employee and essentially nothing happening. The other examples, again, it ties in with Ziske's where this is a whole picture, both of what Mr. Perkins was experiencing and what other people were experiencing, that he, as several witnesses within the case, note that he is kind of the voice opposing this type of conduct, both to himself and to others in the workplace because of race. And when we look at, for instance— You do that because of race gratuitously. Where's the evidence of that? With evidence— In other words, disparate treatment is one thing, but you said he saw a white man hit a black man. But does that create racial discrimination? It's the same pieces of evidence emphasized by Judge Keenan with regard to statements made to other people that are facially racial. And, for instance, where the N-word was used to Ms. Garrett. He doesn't allege those things, and he doesn't experience them and doesn't complain about them. Well, ultimately, he was complaining about them from an earlier time, even up from 2012, on continuously up to his constructive discharge at the end of 2014, is that in between this time, he is reporting— that precedes his constructive discharge clearly identifies the frustrations and the physical harms he was having over and over again. I mean, he even includes within the complaint the statistics about the inequities in the pay and progression system and then tied for other people but is also himself. For instance, the machine coordinator position was open and was not provided to him, even though it was open and needed to be filled. So with regard to—I think, you know, I'm trying not to—because I see your point, Your Honor, is that you're wanting to distinguish between the hostile work environment and the disparate— I'm trying to tell you where you're at. You're claiming a hostile work environment and constructive discharge because of a hostile work environment. Yes. And everything you're describing is disparate treatment, which is a more demanding analysis because you have to then focus on the treatment based on race as opposed to some other condition or qualifications or whatever. And this man apparently was a good worker and he had risen to the highest level in his particular class and he looked like he was a guy that was interested in assuring that African Americans were treated the same as white persons in the workplace. That was his—but it doesn't—there's no evidence that there was retaliation because of what he did there. As a matter of fact, no one said anything about his having to leave the company or threatening him. And so that's the type of stuff in a hostile work environment causing constructive discharge, the type of evidence you have to muster is totally different from a disparate impact case. And he has—he doesn't have the same kind of evidence that Ms. Evans had directly. He has the same affidavits. Again, this offensive language, racial slurs, no question. But what evidence do you have that's on a par with—in Mr. Perkins' case, it's on a par with the Angela Davis, you know, hairdo, that kind of thing, that, you know, overtly racial comments to supplement the third-party evidence coming from those affidavits that are clearly racially oriented? Well, I think there is less direct evidence in this Mr. Perkins case in the sense that— not as disparate treatment but as evidence of hostile work environment, like the Ms. Evans situation, oh, you know, your hairdo, and is that natural, and, you know, calling her Angela Davis and that kind of thing. What analogous direct evidence do you have in the Perkins case that goes to hostile work environment? I think it's Mr. Nyman's response in how he describes Mr. Perkins. I mean, I think that that goes directly to the mindset of how he's being treated from the mindset of the leader who's in charge of the department. So Mr. Nyman is identifying Mr. Perkins as someone who keeps things stirred up, and he's frustrated for and against Mr. Perkins, and that matriculates down from a leader through all of the managers who are interacting with Mr. Perkins. As noted in the record, Mr. Perkins tried repeatedly to speak with his supervisors in person and by email, and they just simply ignore him and not respond to him over and over, and that's through— You're saying that's evidence of hostile work environment where in the record at 314 and 459, Nyman refuses to talk to black employees? Yes, Your Honor. Okay. And I think that that goes more towards the circumstantial evidence aspect. The one you just mentioned, but again, it's the totality picture here. I don't think there's one piece of evidence that can be looked at localized only with regard to the workplace that Mr. Perkins was experiencing. I think his own words from why he was complaining and why he was leaving are the most evident of what he was experiencing. Mr. Perkins wasn't represented by counsel when he wrote that. I didn't even meet him until probably about a year later at that point. The things that he was saying in his hotline complaint were things that weren't just the first time he'd said it. It wasn't the tenth time he'd said it. He'd tried over and over again to improve the workplace so that everybody, regardless of their race and gender, would be treated equally in the workplace. And, for instance, I think one of the key pieces, for instance, a white male supervisor manager who didn't even have a high school degree, Mr. Taylor, had a management position, but yet Mr. Perkins, someone who has a degree, highly qualified, by all accounts was an excellent employee, was told he wasn't going to be promoted. That's not a hostile work environment. That's disparate treatment. For us to analyze that particular charge, but almost everything you've said, we would have to first see whether race was a causative factor, whether there were other factors, the qualifications, the experience, why the decision was made, who the job was fulfilled by. These are all aspects that we don't have in the case, and you could have filed that, but I thought you were charging a hostile work environment based on race, severe and pervasive hostile work. I know my time is up, but may I quickly respond, Your Honor? Sure. Thank you. We have both hostile work environment, constructive discharge, and disparate treatment claims here, and I think it's very important from a procedural standpoint, as I put forth, is that the district court provided no analysis for why the dismissal occurred, other than to seemingly adopt the report and recommendation. So from that same analysis, I think even that's an appealable issue in and of itself from a procedural standpoint. Okay. Thank you. Thank you. All right. Mr. Gilley. May it please the Court, I'm Matthew Gilley here on behalf of International Paper Company. Your Honor, this case reminds me a bit of a story told by one of my former law professors, sorry, one of my former law partners when he was before this court, where he had made his argument, was very proud of his argument, but the one question that he got from the bench was, well, sir, that's a wonderful argument, but can you point me to one place in the record that supports anything that you just said? Sure enough, he couldn't and knew that he was doomed. The plaintiff's argument comes from the same perspective here. There are innumerable allegations made, but in terms of the actual support in the record to support those allegations, the record is completely bereft. Well, the affidavits are there. The affidavits are there, Your Honor, but I think we have to consider the fact with the affidavits that even though Ziske does allow for the consideration of other people's experiences and things like that, what we still have to consider in terms of a hostile work environment cause of action or in a disparate treatment case, if that is what is being brought here, is that those affidavits, we have to look at them less for the quantity, which is what the plaintiff wants us to look for, and more to their content and what they reveal to us. Well, I think the content is arguably pretty damning in terms of consistent reuse of the N-word and as the things that I've repeated here, but it seems to me that your stronger argument is what is the direct evidence as to him, Mr. Perkins?  We've got evidence here that Mr. Niman just wouldn't talk to him and essentially just brushed off all black employees, including him. Is there any other evidence in the record that you think would support, or arguably? I mean, you're saying there's no evidence. Is there anything else that we're missing here in terms of analysis? I really don't think so, Your Honor, because whenever you look at the different things that Mr. Perkins talked about, he certainly satisfies the subjective prongs of his hostile work environment and constructive discharge. I mean, that's pretty much a given in any sexual harassment or any sort of harassment or constructive discharge case. But moving beyond to get to the objective portion of the analysis is where he is clearly falling short. For instance, the allegation that his perception was that Mr. Niman ignored him and other black employees, if you look at the Matvea v. Bald Head Island management case, in that case a situation of outright co-worker ostracism was not enough to satisfy the severe or pervasive prong of the hostile work environment analysis. Wasn't Niman, though, a supervisor? Niman was a supervisor, Your Honor, but— If your supervisor won't talk to you, that's because you're black. I'm not saying that happened, and I'm saying that that's the allegation. Isn't that more significant than just co-workers giving you the cold shoulder? Well, it's possible if the record would actually support that that had, number one, occurred, and, number two, that it was because Mr. Perkins was black. As you'll see in the testimony— I'm sorry to interrupt you, but there's evidence in the record that that happened. I mean, he said it. That's sworn testimony. Now, there may be contradictory evidence. There may not be a bunch of additional support. Isn't the issue that—I mean, so if the issue is that's not in the record, I think that's a problem because a plaintiff's testimony is evidence in the record. But isn't the issue that that, even if accepted as true, doesn't rise to the level of severity and pervasiveness that a hostile environment claim requires? Absolutely, Your Honor. I believe that is certainly the case. I think you can look at Carter v. Ball in terms of the way that the plaintiff in that case had objected to the way that his lieutenant was treating him and giving him work assignments. And additionally, to go back to the record in this case, there is testimony in the record from Taft Gaiman, who is an African-American supervisor in the Finnish Products Department who had worked with Mr. Perkins for decades, who testified that, yes, Gary Nyman did have an unusual management style that caused friction for both black and white employees, and that white employees had also complained to Mr. Gaiman about his management style. Similarly, Walt Patrick, the Director of Human Resources for the Eastover Mill, also testified to a white employee coming to him and complaining about Gary Nyman's communication style and the way that he managed. So in terms of the communication gaps that were observed in Mr. Nyman and perhaps perceived to be an issue of race, there is evidence on the record that states that both individuals of two races were coming to both an African-American and a white manager to complain about this style. But to look at the claims here, I believe that the colloquy that you had with my colleague about the nature of exactly what the lawsuit here involves was a very instructive one. Because the fact that we had pointed out in our brief at note 6 on page 17 that it's unclear in this case exactly what the claims are. First of all, do we have a separate hostile work environment claim, or is the hostile work environment pled as a predicate to the constructive discharge claim? And also, is there a disparate treatment claim here? Is that at the center of the case, and is constructive discharge argued to supply the adverse employment action for the disparate treatment claim? It's really up in the air, and it's very confused. And I think that the district court in this case did extremely good work in parsing through the record and parsing through the arguments in stating that, first of all, there is no hostile work environment because the actions on the record do not rise to the level of severity or pervasiveness, particularly to Judge Keenan's point about certain of the elements mentioned in the affidavits. There may have been racial slurs, and there was testimony about that on the record, but in Mr. Perkins's case, it was clear that it was not directed at him, and number two, it was just something that he had heard about. Furthermore, through the testimony of Audrey Bright, an HR generalist at the mill, in every single instance where something like that has occurred, where there has been an overt racial instance, there has been punishment. For instance, an employee who had used a racial slur talking about African Americans had been suspended for five days. If you look at the Cronin v. South Carolina Department of Corrections case from the District of South Carolina, one of the things that you have to look at from the employer's perspective is what did the employer do when those things that should not have happened actually happened. Did the employer sit there and do nothing, or did the employer act when it learned about it? In this case, the evidence is very clear, and it is undisputed, that International Paper learned of incidents, and they immediately knew that these incidents were not in keeping with their policies regarding equal employment opportunity and nondiscrimination. They took action, and at least in this one case, suspended the employee. It's not disputed, though. I think there was testimony, isn't there, right around 360, 364, saying that these comments, the N word, were made without any repercussions on the employees. Isn't that a disputed issue of fact? Your Honor, the testimony that you just read was a conclusory declaration as to that. There were no specifics as to time, place, and what occurred. To the extent that the record reveals instances that were specific as to time, places, and what occurred and who did it, the record is very undisputed that the International Paper Company took immediate action in those situations. Anything else? Excuse me, Your Honor? Anything else? I was going to mention, Your Honor, that in terms of the racially hostile work environment, that what we have here moving from that on into constructive discharge is that we just have a situation of these are workplace disputes regarding some possibly callous behavior, but don't describe the severe or pervasive activity that you normally see. Finally, in terms of retaliation here, I think it's very important to point out, as we did as a reminder to what we had briefed, that to the extent Perkins engaged in any protected activity in this case, it occurred after he left employment. There has been some argument in the briefing from Mr. Perkins that he actually left in November of 2014 when, in fact, his last day of work was August 22nd and he began his new job the following Friday on August 25th. He has attempted to argue in his briefing that he remained employed through November 1st of that year. However, if you look at the Green v. Brennan case, it states that a constructive discharge occurs upon resignation and not upon effective date. Frankly, we believe that even without that statement from Green v. Brennan that we would win on that point, but it just further emphasizes here the lack of causation on the retaliation angle. The only other conceivable protected activity was this issue that my colleague pointed out earlier regarding the winder, which happened approximately two and a half years before he left his employment. Even if there could conceivably be a constructive discharge in this matter to supply an adverse employment action for a retaliation case, the two-and-a-half-year gap in between those two is just simply too much to sustain. According to the Kazi v. Balogh case, I'm noting that a 13-month interval is going to be too far. At the end of the day, Your Honors, this is a constructive discharge, retaliation, and possibly disparate treatment case where the record just is severely deficient and does not provide a genuine dispute of material fact of where any reasonable jury could return a verdict for Mr. Perkins on any of his claims. Therefore, we ask that you affirm the district court's well-reasoned and full adoption of the magistrate judge's report and recommendation in this case, which has faithfully interpreted this circuit's and the Supreme Court's standards related to all these claims. Thank you. Thank you. Ms. Paulvey? Thank you, Your Honors. First, I'd like to start where I left off from the previous presentation, which was with regard to the order itself. The district court's order was three pages, and one paragraph cited the four cases as grounds for the severe and pervasive dismissal, and then the last paragraph was the basis for his finding that there was not the necessary severe and pervasiveness. But the order itself— It refers to the R&R from the magistrate. It does. I agree it was not as robust as perhaps in the first presentation, but can't we consider the report and recommendation that it adopted and referred to? Exactly, and all we can do is to rely on what the report and recommendation is for the basis for dismissals. And so I just want to kind of distinguish first the disparate treatment claim, which is one of the claims involved in this case. And as I've previously briefed, the basis for dismissal per the R&R from the magistrate judge was a finding that the disparate treatment claims were all untimely, which, as I note here, there's multiple that are within the 300-day time frame. Specifically, and I can identify for brevity purposes, the ones as the denial of overtime, the denial of the machine coordinator position left vacant by Otis Taylor, no annual reviews, denial of opportunity to compete for management positions. As I previously noted with regard to other white male managers who didn't even have a high school diploma, but yet my client who has a degree was told he can't advance to those management positions. So that is the underlying disparate treatment claims that are timely, and the only basis for dismissal from the lower court is on timeliness. It's not even the substantive core of the evidence here. They were saying that all of the disparate treatment identities are dismissed on timeliness matters, and the ones I just listed to you are within the 300 days from when my client submitted his charge of discrimination, which was on December 11, 2014. Next, I want to segue to the constructive discharge claim because I do think it's important to see what was precipitating my client leaving. We look at the Joint Appendix 1027. It's actually notes from the male manager when he met with Mr. Perkins. Mr. Perkins talked about that he was leaving early, that he felt, and I quote, much stress, medical issues, and it's starting to affect his marriage. The department morale is at an all-time low. Minorities have no voices. Black people, especially women, are being discriminated against. Those are things that my client reported to the male manager about the workplace, and the fact of the matter is it wasn't the first time. When we look back at the record from the HR zone investigations, they noted that Mr. Perkins had submitted emails to which he had not been responded to. He was not being spoken to by the management. These were all following his protected activities. They didn't just happen when he's leaving, though he's clear in his hotline complaint and his interview with the male manager why he's leaving, but these acts that preceded show that he was trying to essentially change the workplace, how he was being treated and others because of discriminatory bases in the workplace. Next, I want to note with regard to whether International Paper did any action with regard to retaining Mr. Perkins, is that ultimately they don't make the same argument here that they did any try to action to keep Mr. Perkins, despite that he was an excellent employee. They don't have to try to keep him. I don't want to say wanted, but he had decided to retire, and he had interviewed with CASA. He had a good job. He was going to a really good job with CASA, so they could have thought, well, maybe it's his time to go. Well, the distinguishing is in the records. My client took at least a half hit on his salary, and he was notifying them he was leaving early because of the treatment. He wasn't leaving to go to CASA, and so I think, again, we have to go kind of the macro back out is what are the burdens here?  Is International Paper entitled to judgment as a matter of law because there's no issue or dispute of material fact at issue? And there are disputed facts of the workplace that Mr. Perkins was working in, both of what he personally experienced, as well as the ZISKY kind of context of what was individuals in his protected class experiencing in that same workplace in the same time? Thank you, and I'm happy to answer any questions if you have any. We'll adjourn court. Sine die. Come down and greet counsel. Thank you. This honorable court stands adjourned. Sine die. God save the United States and this honorable court.
judges: Paul V. Niemeyer, Barbara Milano Keenan, A. Marvin Quattlebaum Jr.